## HASTINGS v. HALLECK.

*Twelfth District Court for San Francisco Co., March T.*, 1858.

ATTORNEY AND CLIENT—NEGLIGENCE—LIABILITY—DAMAGES
—BURDEN OF PROOF.

In an action brought against an attorney for damages resulting from an alleged want of reasonable diligence and skill, the presumption of law is that the attorney did discharge his duty to his client, and the burden of proof lies with the plaintiff to establish the fact of negligence affirmatively.

An attorney is liable to his client for any damage resulting to the latter, from a failure on the part of the former to exercise reasonable diligence and skill in the conduct of an action.

In an action brought against an attorney for professional negligence in conducting the defence of another action, the burden of proving damage as well as negligence, lies with the plaintiff. And, it being alleged that the last mentioned action was lost through the negligence of the attorney, it is incumbent upon the plaintiff to show affirmatively that a good and valid defence to the action existed, entirely irrespective of the manner in which the defence was conducted.

An action was brought against *A.* to recover a certain amount of money borrowed by his attorneys in fact, who were acting under a power of attorney. The principal defence interposed was that the power of attorney did not confer authority to borrow money. Judgment was rendered against *A.*, and an appeal taken. *A.'s* attorneys did not, in their statement on appeal, raise the question as to the authority of the attorney in fact to borrow money, but prosecuted the appeal on a subordinate question—that of interest. The appellate court awarded a new trial. *A.'s* attorneys then stipulated that the judgment of the court below should stand affirmed, deducting the sum decided by the appellate court to have been erroneously allowed as interest. In an action by *A.* against his said attorneys for professional negligence, it was—

*Held*, that by failing to raise in the appellate court the main question in the case, to wit, whether the power of attorney conferred authority to borrow money, then waiving by stipulation a new trial, on which the question might again have been raised, the attorneys were guilty of such negligence as would render them lia-

ble to *A.* for all damage which he may have sustained by reason of such neg-
ligence.

In an action brought against an attorney for alleged professional negligence through
which judgment was recovered against plaintiff in a certain other action in which
plaintiff was defendant, and to satisfy which said judgment certain real estate
belonging to the then defendant was sold under execution, the damages which the
then defendant may be entitled to recover against the attorney, is not the value of
the property sold, at the time of the institution of the action against the attorney,
but is the amount of said judgment.

This was an action brought against defendants, attorneys at law,
to recover the sum of $60,000 damages, alleged to have been sustained
by reason of their culpable professional negligence and carelessness.
An action was commenced in February, 1855, by *Adams & Co.*,
against plaintiff, to recover the sum of $25,098 $\frac{11}{100}$, with interest, which,
action, defendants were retained, as attorneys, to defend.   Judgment
was recovered therein against plaintiff, in April, 1856, for $37,386,
and plaintiff's interest in certain real estate was sold under execution
issued on the same, in April, 1857, for the sum of $22,000.   It is al-
leged, substantially, that the defendants, in conducting said action on
behalf of plaintiff, were guilty of gross professional negligence, (cer-
tain acts being specified,) owing to which, said judgment was recov-
ered against plaintiff.   That plaintiff's interest in said property, which
was sold to satisfy said judgment is now worth $60,000 ; wherefore,
plaintiff prays judgment in that sum.

The facts proven upon the trial were substantially as follows :

Plaintiff, *Flint, Peabody & Co., I. C. Woods* and *D. Haskell*, (the
two latter partners of the banking house of *Adams & Co.*,) were joint
owners of six fifty-vara lots, situated in that portion of the city of San
Francisco, known as North Point. It being deemed advisable by the
owners to improve the same, plaintiff, in the summer of 1852, began
and superintended the construction of a wharf and warehouse,(the latter
being the same known as the North Point Dock Warehouse,) to which
he continued to give his attention until July, 1853.   It was necessary,
in order to make room for the construction of the warehouse, to exca-
vate the hill abutting upon the bay at that point.   This hill was com-
posed of stone, suitable for being employed for building purposes, and
clay.   Plaintiff employed an engineer of the name of *Huerne*, to con-
duct the erection of the warehouse and wharf, although he himself

acted as general superintendent. About the end of July, plaintiff retired from the superintendence of the works, and went to the Atlantic States on a visit. At the time of his departure, the front part of the wharf, one hundred and seventy-five feet, was then in perfect order for the landing of goods, but it was not completed up to the warehouse. A tongue of land ran out alongside of the wharf, and in the condition in which it then was, the only way to have got goods from any vessel that might have been lying there, to the warehouse, would have been to have landed them on the wharf, passed them thence to the tongue of land, and then have conveyed them up to the warehouse. By laying down planks, however, a sufficient flooring would have been furnished to have conveyed merchandise upon, over the wharf itself. There was no road to the warehouse then. The warehouse was about half completed ; the back wall was finished some feet above the floor of the second story ; the side walls were completed to the floor of the second story, throughout their entire length, and for a distance of about one hundred and twenty feet down from the back wall towards the bay, they had been carried up about four feet more. The front wall was not built at all up to this time. The building had been constructed of the stone obtained by the excavation of the hill. If the stone had not been so used, it would have been necessary to have removed it. The filling in had been done with the same material. The first story was then ready to receive storage to about half its capacity, between fifteen and twenty-five hundred tons ; it was covered to that extent by the flooring of the second story. In 1853 and 1854, it was customary to receive goods on storage, in buildings not completed, by covering them over with heavy canvas. The said warehouse then could have been completed, with the materials and pursuant to the plans according to which it had, up to that point, been constructed, at a cost of $19,507, or a little less. A short time prior to his departure, plaintiff constituted one *Briceland,* who had been living in Shasta, and who came to San Francisco at his request, jointly with *J. P. Haven,* of the latter place, his attorneys in fact, by a certain power of attorney executed to them, and hereafter more particularly described. *Briceland* came to San Francisco for the purpose of taking *Hastings'* place, as general superintendent of the works at North

Point. He came down a few days before *Hastings* left, was present at the warehouse and wharf, observed the manner in which the works were going on, how the accounts were kept, the disbursements made, and all matters and things generally, relating to the works. He was, upon *Hastings*' departure, to assume the same duties which the latter had assumed, and to do exactly as he had done. The workmen had been always paid at the end of the week, under the superintendence of *Huerne*, by checks drawn by *Hastings* upon *Adams & Co.*, and by the latter charged to the account of the North Point Dock Warehouse. All other disbursements were made in the same way, that is, by checks upon *Adams & Co.*. About the time when he resigned the superintendence to *Briceland*, and a day or two prior to his departure, *Hastings* had a general settlement with his co-owners, touching the expenditures and disbursements, on account of the warehouse and wharf; these had then amounted to $52,000. At that meeting *E. P. Flint*, of *Flint, Peabody & Co., I. C. Woods* and *D. Haskell*, were all present. It was then understood and agreed that the improvements should proceed on his (*Hastings*') plans, and that the receipts from storage and wharfage should pay for them. The receipts for the first six months of 1854, would have averaged $2,000 to $2,500 per month, and for the last six months, from $4,000 to $4,500, the wharf being then completed. The wharfage for such a ship as could then have lain at the wharf, would have been from $50 to $60 per *diem*; storage at that time was worth from one to two dollars per ton, per month.

The power of attorney executed by *Hastings* to *Haven* and *Briceland*, was in the words following:

" Know all men by these presents, that I, *John Hastings*, of San Francisco city and county, state of *California*, have made, constituted and appointed, and by these presents do make, constitute and appoint, *J. P. Haven* and *J. N. Briceland*, separately and jointly, my true and lawful attorneys, for me, and in my name, place and stead, to collect, receive, and receipt for, all sum or sums of money due, or that may hereafter become due, as my proportionate share of rents or other profits, in and of a certain property contained within the parallelogram

bounded by Sansome and Montgomery, Chestnut and Lombard Streets, in the city of San Francisco; *to represent me and my said interest therein*, and to cast my vote in relation thereto, in common with my own co-tenants and co-partners therein, in all matters relating to the administration or improvement of said property, and to do and perform any and every act or thing relating to and concerning my interest aforesaid, excepting the sale or hypothecation thereof, as I, if personally present, might, could, or would do, in the premises. Giving and granting unto my said attorneys, full power and authority to do and perform all and every act or thing whatsoever, requisite to be done in and about the premises, as fully, to all intents and purposes, as I might or could do, if personally present. With full power of substitution and revocation—hereby ratifying and confirming, all that my said attorney or any substitute shall lawfully do or cause to be done by virtue hereof.

" In witness whereof, I have hereunto set my hand and seal, this first day of August, one thousand eight hundred and fifty three.

" Signed, sealed and delivered,  
      in presence of     " *John Hastings,*   { L. S. }  
" *E. V. Joice.*"

At the time *Hastings* left, he expected that the North Point warehouse would be a self-sustaining undertaking—that the income arising from storage would exceed all expenditures by $500 or $600. *J. P. Haven* combatted this idea, but *Hastings* was sanguine and very positive upon the point. He, however, stated to *Haven*, that if any advances should be required, they would be made by his co-owners. He also proposed to *Adams & Co.*, to make the advances at one and a half per cent. per month, but they—the current rate of interest being then three per cent.—refused to accede to the proposition.

After *Hastings'* departure, *Briceland* superintended the work in pursuance of the arrangement made between the owners, in the same manner that *Hastings* had prior to his departure. *Woods*, however, was the managing owner. *Briceland* exercised the same general supervision, and made the payments in the same way—by checks on *Adams*

*& Co.*—as *Hastings* himself had done. Shortly after *Hastings* left, however, alterations were made in the plans, both as to the warehouse itself and the wharf. The alterations were made by *I. C. Woods*, without consulting with the co-owners; he showed them to *Haven*, saying that the alterations had been made, and the latter expressed his opinion that they were wise ones. *Haven*, however, had but little to do with this branch of *Dr. Hastings'* affairs; although appointed a co-attorney with *Briceland* with regard to *Dr. Hastings'* interest in the North Point Warehouse, yet he also held another and more general power of attorney, and was *Hastings'* general financial agent. *Briceland* had more especial charge and oversight of the matters relative to the property at North Point. When the alterations were first suggested to him by *I. C. Woods*, he objected on the ground of the greatly increased expense which they would entail. When *Hastings* left, the understanding between all the owners was, that the building was to have been completed according to his plans, and as quickly and cheaply as possible. According to his plans, two, or at the utmost, two and a half months, would have sufficed for this purpose, entailing a further outlay of $20,000. *Briceland*, however, becoming satisfied that it would be more for the interest of the owners, and not much more expensive, assented to the alterations; *Haven*, upon this, gave his assent also; *Flint, Peabody & Co.*, were not consulted, but when informed of the changes, did not make any opposition, or object to the accounts presented for the improvements. *Adams & Co.* were their bankers, and they were upon friendly terms with them, which, as testified by *E. P. Flint*, of said firm, might have operated in inducing them to assent. The alterations in the plans were principally the substitution of pressed brick of Boston or Philadelphia make, for the front wall, and *California* brick at the sides, for so much of the walls as were then unfinished above the first story, in lieu of the stone obtained by the excavation,—of stones, clay and piles for the wharf, and foundation of the front wall, both of which where laid under water, instead of the pure stone obtained from the same source, and theretofore used while under *Hastings'* superintendence; and some minor changes and alterations superinduced by the adoption of the principal ones, just men-

tioned.   Several builders testified that the alteration in the founda-
tion, from pure stone, to stone, clay and piles, was not judicious under
the circumstances of this case—the latter being only preferable
where the bottom had a considerable inclination, while in this in-
stance it was nearly horizontal, excepting only for a short distance
near the extremity of the wharf ; *Briceland*, however, considered that
the change had saved the wharf.   *Huerne* gave up any connection with
the improvements soon after the alterations were adopted.   The improve-
ments were completed in January, 1854, and were then leased to *A.
A. Cohen & Co.*, for $3,000 per month.   *Flint, Peabody & Co.* were
dissatisfied with the lease, but their relations being friendly with *Woods*
and *Haskell*, they did not like to dissent ; *Haven* thought that the
terms of the lease were about as good as could be obtained ; *Briceland*
was of a strongly dissenting opinion at first, but afterwards concurred
with *Haven* that it was about as good a thing as could be done.   At
that time there was no way of getting to the warehouse from the land
side with a vehicle.   *Cohen*, after he took the lease, opened a road at
an expense of about $1,000.   *Dr. Hastings* returned to this country
in March, 1854, and left again in May, of the same year.   At the time
of *Hastings'* return, he instructed Mr. *J. Peachy*, who also held a
power of attorney from him, conferring the superintendence of certain
other real estate owned by him in San Francisco, to inform *Adams &
Co.* that he (*Hastings*) repudiated the lease.   *Peachy* did notify them
by letter, as requested by *Hastings*.

The improvements at North Point had been finished in January,
1854, at a cost, in addition to the $50,000 expended by *Hastings* pri-
or to his departure, of $100,336$\frac{44}{100}$, of which his share was $25,089$\frac{11}{100}$.
A run upon the bank of *Adams & Co.*, took place in the first week of
February, 1855, and *I. C. Woods* became urgent for *Hastings'* share
of the money advanced by the bank on account of the North Point
Dock property.   He first desired *Haven* and *Briceland* to execute a
mortgage upon *Hastings'* interest in the property ; but that power be-
ing expressly withheld by the power of attorney, they executed to
*Adams & Co.* an acknowledgment of indebtedness upon the part of
*Hastings*, in the following words :

" $25,089 $\frac{11}{100}$.                    San Francisco, Feb. 13, 1855.

" On demand, for value received, we acknowledge an indebtedness to *Adams & Co.*, on the part of *John Hastings*, in the sum of twenty-five thousand and eighty-nine $\frac{11}{100}$ dollars ; and an additional indebtedness of three per cent. per month interest on the amount of the above indebtedness, from the different dates of its advance, which advance has no reference to the date of the note.   The debt from *John Hastings* to *Adams & Co.* has arisen in consequence of advances made by *Adams & Co.*, for the construction of wharf, buildings, and filling in, at North Point Dock property.

" *J. P. Haven,*      ⎱ Attorneys for
*J. N. Briceland,* ⎰ *John Hastings.*"

The reason of giving this note, or rather acknowledgment of indebtedness, was that *Woods* was urgent for his money.   *Briceland* feared that if something were not done, he would secure his demand by attachment, and that *Hastings'* interests would thereby be sacrified— *Woods* stated as much to *Haven*—that he would attach unless some security were given him.   Finding that they had not the power to mortgage, the attorneys executed to *Adams & Co.* the above instrument.   On the 18th of Feb. *Adams & Co.* commenced suit, by attachment, in the superior court of the city of San Francisco, declaring upon the above evidence of indebtedness. *Hastings*, as before stated, arrived in March, and found the action pending.   He left on the steamer of the 1st of May, remaining in the city about seven weeks.   He then engaged the services of defendants to defend the action. *Hastings* left the state without personal service having been had upon upon him in the action instituted by *Adams & Co.*

Subsequently to this, *Mr. Peachy*, at the request of *Mr. Hackett*, (of *Hackett & Casserly*, attorneys for *Adams & Co.*,) signed a stipulation in the following words :

" The defendant, *John Hastings*, admits due and legal service of a

copy of the summons and complaint in this case, upon him personally, at the city of San Francisco, as of the first day of December, eighteen hundred and fifty-four, and stipulates that his appearance shall be entered in this cause upon filing this stipulation with the clerk of this court, on said first day of December.

" Dated August 31st, A. D., 1854.

" HALLECK, PEACHY, BILLINGS & PARK,
" Attorneys for *John Hastings.*"

On the 14th of December a default was entered against *Hastings,* and judgment rendered in favor of *Adams & Co.,* according to the prayer of their complaint; and upon this judgment execution issued to the sheriff of the county of San Francisco, and by him a levy was made under the same upon the interest of *Dr. Hastings* in the North Point property. Upon hearing of the proceeding, *Mr. Peachy* obtained an order on defendants to show cause why the default should not be opened. In his affidavit, on motion to open the default, after setting forth that defendant had a valid defense, etc., he says that when *Hastings* was here, he (*Hastings*) had several interviews with *D. H. Haskell,* one of the plaintiffs, and refused to pay the amount for which the action was brought, " upon the ground that his attorneys, who gave the undertaking mentioned in the complaint, were not authorized to borrow money for defendant; and that the money, if any, which was advanced by *Adams & Co.,* on the said undertaking, if applied to the improvement of defendant's land, was so applied without his knowledge and consent, and contrary to his wishes and views with regard to the improvement of his property."     *     *     *     That—

" In the latter part of last August, *John K. Hackett, Esq.,* one of the plaintiffs' attorneys in this cause, requested affiant to appear for the defendant in this cause, and to acknowledge service of summons, saying that it would prevent the necessity of serving the summons by publication, which would be disagreeable to one of the plaintiffs, *D. Hale Haskell,* and to the defendant. That affiant refused to do so, and stated to *Mr. Hackett* that the defendant had no objection to service of summons by publication; that on *Mr. Hackett's* subsequently

urging affiant, on more than one occasion, to consent to appear for the defendant, he agreed to do so, with the full understanding and agreement, and with the assurance on the part of *Mr. Hackett*, that the defendant should not thereby appear to answer sooner than he would be obliged to do, if the summons were served by publication. With this understanding, affiant agreed to dispense with the service of summons by publication, and to be considered as appearing for the defendant at such time as by law the defendant would be held to appear, under the service of summons by publication, and not at an earlier day. That this agreement was made on the street; and *Mr. Hackett* told affiant he would send him a stipulation to that effect, to sign, and affiant promised to sign it. That a very short time thereafter, that is, within day or two, *Mr. Hackett* sent to the office of the affiant the stipulation filed in this case, which the affiant signed without a particular examination of the points of time therein specified, and a comparison of the same with the times fixed by law for publication, and for appearance, and for answering—taking for granted that *Mr. Hackett* truly expressed, in said stipulation, the agreement made as aforesaid, at *Mr. Hackett's* instigation and special request."

And then the affidavit goes on to state, that *Mr. Peachy* had no knowledge of any of the proceedings, etc., until he heard of the issuance of the execution.

The default was ordered to be opened upon payment of costs, and leave to answer was granted.

Defendant put in a general denial for *Hastings*, and the cause came on regularly for trial. The trial was principally conducted by *O. L. Shafter Esq.*, for defendant, and *E. Casserly Esq.*, for plaintiff. *Mr. Peachy* was present in court during the whole of the trial. The first connection of *Mr. Shafter* with the case was about the time when the amended answer was put in. His attention was called, by *Mr. Peachy*, to the power of attorney to *Haven* and *Briceland*, with the request that he would examine and satisfy himself whether it conveyed the authority to the persons to whom it had been made, to borrow money in the name of their principal. *Mr. Shafter* examined and satisfied himself that the language of the instrument did

not necessarily carry that power, and was inclined to think that the power was not in the instrument. It then became a subject of consideration between himself and *Mr. Peachy*, as to the character of the facts and circumstances which existed at the time the instrument was executed, supposing that the other side might rely on these facts for the purpose of aiding in the construction of the paper. *Mr. Peachy* suggested that *Briceland* had the superintendence of the works, and probably could inform them as to all these facts. *Briceland* informed *Shafter* and *Peachy* that it was supposed at the time that the power of attorney was given, that all the owners were informed of the condition of the building. He said that at the time the note was given the work was in progress of erection; that it was contemplated to go on to a conclusion, and that *Dr. Hastings* had left no money behind to meet the outlay. After the termination of the interview, *Shafter* and *Peachy* came to the conclusion that the testimony would be adverse to them, and determined not to call *Briceland* as a witness, anticipating that the other side would do so to prove facts and circumstances for the purpose of aiding in the construction of the instrument. *Mr. Shafter* examined whether his testimony would be admissible for the purpose, and was very well satisfied that the evidence, if offered, would be received. The evidence was offered and objected to, but the objection was overruled, and the testimony received.

During the trial *Mr. Haven* and *Mr. Briceland* both testified that they each assented to the alterations in the plans. *Mr. Haven* further testified that when *Dr. Hastings* went away, he, *Hastings*, attended to the possibility of funds being wanted to complete the dock, and that he wanted the other parties to consent to advance whatever might be wanted at one and one half per cent. per month. There was evidence introduced that after the power was executed, supplementary authority was given. No question was made as to the shape of the note, but objection was made to the introduction in evidence of the note itself, under the power of attorney. The only ground upon which the defense was prepared, was as to the construction of the power of attorney, and as to whether, under it, money could be borrowed or not. *Mr. Shafter* was not aware, prior to the trial, of any alterations hav-

ing been made in the plans, and when aware of the fact it did not occur to him as a possible ground of defense. The case was argued to the court on the day after the close of the testimony. There were three points made for the defense :

1st. That the power of attorney, by the force of its language, did not carry any such power.

2d. That when read in the light of the facts and circumstances under which it was given, it did not carry any such power.

3d. That the testimony in the case which tended to show that a supplementary authority had been given, after the power of attorney had been executed, would not necessarily, by a fair construction, justify the finding of such a fact.

There was another point that was made :

That the face of the acknowledgment did not carry interest from its date back to the dates of the several advances—nor interest forward at three per cent. per month.

The action was determined adversely to *Hastings*, and notice of appeal from the whole judgment was given. *Mr. Shafter* prepared the case for the supreme court. The statement admitted the authority in the attorneys to borrow the money. The only point made in the supreme court was, that interest should not have been decreed on the amounts of the several advances from the dates when they were severally made, on the ground that there was no consideration for such interest. *Mr. Shafter*, on the trial, testified of the statement on appeal : " I intended to put enough into the statement on appeal to secure a reversal of the judgment, and I did." The judgment of the court below was reversed. *Adams v. Hastings*, 6 *Cal.*, 126. Upon the rendition of the judgment in the supreme court, reversing the judgment of the court below, a stipulation was entered into between *Mr. Peachy* and *Mr. Casserly*, reciting substantially that, for the purpose of saving the expense, etc., of a new trial, it was agreed that the judgment of the court below should stand affirmed, deducting therefrom $737, the sum decided by the supreme court to have been erroneously decreed as interest—leaving $37,385, being the amount of *Hastings'* share of the expense of the North Point works, less his share of the rents ac-

crued from the same property, and received by *Adams & Co.* They had been paid by *A. A. Cohen & Co.* to *Adams & Co.*, under written instructions from *Hastings'* attorneys. *Dr. Hastings* returned in 1855, before the statement on appeal was filed. He had frequent interviews with *Mr. Shafter*, and wanted to know about the course of the trial. *Mr. Shafter* told him all about the litigation, as far as it had proceeded. From that time until the cause was decided, *Hastings* called upon *Mr. Shafter* occasionally. He was greatly surprised at the course things had taken. In the language of *Mr. Shafter*, " his principal grievance appeared to be that we had not defended the case on the ground of departure from the original plan. I told him that so far as I was concerned, I did not know of any such departure, and that if I had I did not think that it would have made any odds. I told him that a new trial would be of no use to him, unless he could overcome the testimony of *Haven* and *Briceland*, and that under the same state of facts we should be sure to be beaten. I do not remember of his having indicated to me the name of a witness by whom their testimony could be overcome."

*Mr. Casserly*, and also judge *Shattuck*, before whom the case in the superior court was tried, both testified to the able manner in which the defense was conducted. The former stated that but little cross-examination was made by the defense, as it served but to fix the liability more firmly upon them ; and that, now that a question upon the subject had arisen, it was his opinion that as much had been made of the case by the defense as could have been made.

*F. J. Lippitt, B. Peyton*, and *N. Bennett*, for plaintiff.

Defendants *in pro. per.*, and *G. Yale*, for defendants.

The first inquiry is, as to the character and extent of the obligations under which the defendants, as professional men, undertook to defend the suit of *Adams & Co.* v. *Hastings.* This was to exercise reasonable diligence and skill in their profession as attorneys at law, in defense of the said action. To that extent and no more they were bound. I do not lay down the proposition that an attorney is not responsible, provided he acts to the best of his ability ; a man may act to the best

of his ability, and yet not comply with the contract. He must exercise " reasonable diligence and skill," and that necessarily excludes all acts of negligence, and it is to them that responsibility attaches. 2 *Porter,* (*Alabama,*) 210 ; *Pitt* v. *Yalden,* 4 *Burr,* 2060 ; *Pennington's Ex'rs* v. *Yell,* 6 *English,* 217 ; *Seydam* v. *Vance,* 2 *Indiana,* (*McLean,*) 102 ; and *Lynch* v. *Commonwealth,* 16 *Serg. &amp; R.,* 370. The latter is a leading American case, and forcibly lays down the principle, that the liability of the attorney with us is just as great as in *England,* and is governed by precisely the same rules as in the latter country.

Secondly, as to the burden of proof, the presumption of law is, that the defendants did exercise reasonable diligence and skill, in their profession as attorneys and counselors at law, until the contrary is established by evidence in this. case. *Pennington's Ex'rs* v. *Yell,* 6 *English,* 237. That is the presumption in favor of every professional man ; it is not confined to the class of attorneys. I maintain that in this case, defendants discharged their duties to plaintiff to the fullest extent.

But besides this, if there was no substantial defense to the action of *Adams &amp; Co.* v. *Hastings*—if no just and proper defense could have been set up in said action—then the defendants are not liable to the plaintiff in this action. I now refer to 2 *McLean,* 102, where the principle is laid down, that the party who charges negligence in the collection of a debt, must show that there was a subsisting debt, and that the party owing the debt was solvent at the time of the alleged negligence. Here, in this case, it must be shown, before default can be alleged on the part of the defendants that there was a good and substantial defense to the action of *Adams &amp; Co.* v. *Hastings,* without regard to the conduct of the case. *Hagg* v. *Martin, Adm., Riley,* 157 ; *Grayson* v. *Wilkinson,* 5 *Sme. &amp; M.,* 288.

Now, as to whether this power of attorney executed by *Hastings,* gave the power to borrow money, let us examine the facts :—and first, in what condition did *Dr. Hastings* leave the works at North Point— what were the means he left for their completion—what were his own expectations, and how were those expectations realized ? I think it clear that *Dr. Hastings* had no very distinct or definite idea in regard

to what would take place after his departure. *Mr. Briceland* never understood that the improvements were to have been completed out of the profits. *Haven* says *Hastings* had some such idea—that he tried to overcome it—but that he (*Hastings*) gave him a paper to be submitted to *Adams & Co.*, by which they were to advance to the owners who might be behind-hand, including himself, funds to finish the work at a certain rate of interest. *Adams & Co.* refused to make advances at that rate, and as the advances had to be made, *Haven* agreed to give three per cent. *Hastings* left, knowing that *Adams & Co.* would advance him money. These facts show that *Hastings* did not expect that his property would pay for itself. He made provision for loans, the only question was about the interest. He informed his agents where they could get money, but now takes the position that he never expected that any expenditures were to be made for its completion, unless they were made out of the profits. His agents declare very distinctly that the building was not in a condition to produce a revenue. On this branch of the case it may be remarked—*Briceland* says he was to do just as *Hastings* had done ; to use his own expression, he " stepped into his shoes." *Hastings* was drawing upon *Adams & Co.* when he superintended the works ; *Briceland* did the same. In all the minute directions given by *Hastings* to *Briceland*, during the time that the latter was at the works at North Point, preparing himself to take *Hastings'* place, the latter on no occasion intimated to him that the improvements were to be completed out of the profits. No arrangements were made by which a profit was to be derived. No lease or other means of providing a revenue. In view of the facts of the case, there was ample authority, express and implied, entirely independent of the power of attorney, conferred upon the agents, to borrow money. *Hastings'* proposition to raise money was sufficient, or the constituting of a superintendent of the works was sufficient. But we have an express authority given by the instrument—to go on and complete the works. It gives them power to do everything, as will be seen by its terms, except to sell or hypothecate. In giving the note which they executed to *Woods*, the only way in which they affected *Hastings'* interests, was by the promise to pay three per cent. per

month. The liability existed before—the contract was express, and *Woods* could have commenced suit by attachment equally well without the note as with it. The supreme court decided that the obligation could not have a retroactive effect, but that the interest was to be prospective. This was the only effect that that note had, or by any possibility could have had, upon the interests of *Dr. Hastings.*

The suit was commenced in February, and *Hastings* returned in March. He called upon the defendants, and gave them some instructions in the matter. He left again in May, and returned in August. With regard to his first interviews with defendants, we have no testimony. All the allegations upon that point, in the complaint, are denied in the answer. In his second interviews, he wanted to know the character of the defense set up. The jury are necessarily, it seems to me, to try that case over again, and at the outset I repeat the proposition, that unless a good and sufficient defense to that action has been established on this trial, the plaintiff in this case cannot recover. On that trial the plaintiffs, *Adams & Co.*, called both *Haven* and *Briceland* as witnesses, and, as *Mr. Casserly* testified, the more the examination was gone into, the less there was for the defense. They testified then as they have testified now. The plaintiff says that if he had been present at the trial, he would have been able to have refreshed the memories of the witnesses, and have elicited from them the facts constituting his defense. But their testimony is precisely the same now as on the former trial. No more light has been thrown upon the subject now by the plaintiff himself, than was then produced by his attorneys, the defendants.

With regard to the alterations, *Mr. Briceland* says that he made many of them himself, and that *Woods* suggested others to which he at first objected, but subsequently assented. When he found the rainy season coming on, he assented to the substitution of brick for stone in the front wall and second story. Now the power of attorney gives the agents authority to represent *Hastings* and his interest, to cast his vote in relation to this warehouse in common with his co-tenants, and " to do and perform any and every act or thing relating to or concerning my interest aforesaid, excepting the sale or hypothecation thereof." What

does that mean ? Was there any authority conferred on the agents by that written power ? Has there been anything elicited on this trial in regard to the alterations, which goes to show that the money was not properly expended ? *Briceland* assented to the alterations ; *Haven* did the same, so did *Flint.* *Woods, Haskell* and *Flint* were a major-ity, and if *Briceland,* as the representative of *Hastings,* had persisted in his opposition, a withdrawal would have become necessary.

Something has been said about the admission of *parol* evidence on the trial in the superior court. The rule is very well settled that it is admissible. *Story on agency,* 79. It is only necessary that author-ity should be in writing, when something is to be done which requires writing under seal. When *Dr. Hastings* was leaving the state, he gave, for certain special purposes, written authority. Then in a sub-sequent conversation, he gave *Mr. Haven* particular authority in rela-tion to the borrowing of money, and *Mr. Briceland* in relation to the work. When the question came before the court as to the power to borrow money, judge *Shattuck* came to the opinion, from the written instrument, construed in the light of the surrounding circumstances, that such power existed. The facts were that money had been re-ceived—that *Hastings* had been in the habit of drawing money from the house of *Adams & Co.,* and paying for the work done, by checks on the same firm—that *Briceland,* when he took charge, was to do the same thing—and that *Haven* received instructions to raise money in certain contingencies. Viewed in the light of these surrounding cir-cumstances, the authority to borrow was sustained, as it should be.

Again, if the jury believe that the defendants omitted to do any-thing towards the defense of the case, which, if it had been done, would have been unavailing, then the defendants are not liable in this action ; 5 *Sme. & M.,* 288 ; and further, if any important matter was omitted in the defense of the action, in consequence of the absence of *Dr. Hastings,* which might have been done, had he been present aiding and assisting, and that absence was not caused by the advice of the defendants, then they are not liable in this action. To support this I refer to *Spencer* v. *Kennard,* 12 *Texas,* 187.

The decision of the supreme court in *Adams* v. *Hastings,* (6 *Cal.,*

126) did not award a new trial.   The principles upon the facts of the case had been settled by judge *Shattuck*, and *Mr. Shafter* was so perfectly satisfied of the justness of the claim against the defendant, that though an appeal was taken from the whole judgment, the case proceeded upon the question of interest alone.   There was no question made on the appeal as to the facts.   If the case had been tried over again, the result would have been exactly the same.   The complaint here is, that if a new trial had been obtained, *Hastings* being present, the whole result would have been changed; but he has not elicited a single new fact.   In *Dr. Hastings'* interviews with *Mr. Shafter*, he never named any witnesses who could establish a different state of things.   The whole matter was talked over frequently.   If no new testimony could be gotten, a new trial would not change the result. But the *remittitur* did not award a new trial—it went only to the matter of interest.   Even if it had, the defendants, in the exercise of that discretion with which all attorneys are invested in the conduct of an action, in view of the whole case, being certain that there was a liability, were right in adopting the course which they did.

*Balie Peyton* for plaintiff.

The testimony in this case establishes, that at the meeting of the owners of the North Point Dock property, immediately preceding the departure of plaintiff for the Eastern States, it was agreed between them that the improvements then in progress of erection upon that property, should proceed upon the plans which plaintiff had adopted and according to which they had, up to that time, been constructed. It is further established, that they agreed that the work should be finished out of the revenue which could then be derived from it, and *Mr. Flint* and *Mr. Huerne* both concur in the statement that it was possible to obtain revenue out of it.   It was in a condition to receive storage.   That there was a demand for such, has also been proven. The settlement by plaintiff with his co-tenants left several thousand dollars at his credit, at the banking house of *Adams & Co.*   The building could at that time have received twenty-five hundred tons, at

from two to two dollars and a half per ton, while the wharf could have been made to yield from fifty to sixty dollars per day. These are the " surrounding circumstances," in the light of which this case is to be viewed. Besides which, *Huerne* could have completed the building for $20,000, and in two months and a half at the longest, which would have brought it only to the latter part of October, and before, probably, a drop of rain would have fallen. It was under these circumstances that the power of attorney was given, and in view of which the question is to be determined—whether it authorised the agents to contract that indebtedness to *Adams & Co*. We do not complain of the manner in which *Mr. Shafter* conducted the action in the superior court, but we do complain of his having been informed of nothing constituting a defense to that action, except what could be derived from a construction of the power of attorney. As to the construction of this instrument. It gives authority to " receive and receipt for rents." Can it be said that *Dr. Hastings* did not expect that there would be rents to " receive and recept for" ? So far as money is concerned, this was the only authority the agents had. Take this in connection with the fact that *Dr. Hastings* expected to receive from this warehouse a net revenue of $500 to $600 per month, and also $1000 from *Mr. John Peachy*, from the rent of the houses of which he had charge, and can it be said that the power of attorney confers authority to borrow money ?

Authority to borrow money must be given in express and direct terms. *Story on Agency*, 869. If the laborers on that house had come to *Mr. Briceland*, demanding their pay, and had told him that they would attach the property, and he had given them a note, the law would not, under this authority, have conferred upon him that power. It requires that the authority to do so must be express and direct. Was there any authority conferred here ? See also 5 *Mees. & Wels.*, 595. It is held that the rule excludes bankers, but it is not so in this case, for *Haskell* and *Woods* did not stand simply in that relation. They knew every circumstance connected with the case. For this reason, the rule is inapplicable to them. When *Woods* altered the plans, he knew that they were not to have been

altered; that the warehouse, according to his arrangement with *Hastings*, was to be built as soon and as cheaply as possible. Instead of finishing the works in two months and a half, for $20,000, he spent $103,000, and took half a year. *Mr. Woods* had no right to ask to be reimbursed. He advanced the money with his eyes open—in his own wrong—in violation of a solemn agreement.

It is said that it was not necessary for the agents to have given the note which they executed, because *Hastings* was just as much bound before as after. But if an agreement had not been entered into, fixing the interest, it would have been only ten per cent. per annum. The supreme court decided that he was bound to pay three per cent. from the date of the note, making a difference of nearly $10,000 to *Dr. Hastings*, in that one item alone. And this interest was binding, as it was given in consideration of the " forbearance of the plaintiffs to sue." They forbore five days.

With regard to the character of these alterations, there can be very little doubt. *Briceland*, as the agent of *Dr. Hastings*, did at first object to the alterations, and it was only when the rainy season was coming on—before which the building would have been completed, according to *Hastings'* plans—that he assented. *Huerne* says that the alterations which delayed the completion of the work were positively injurious. The stone had been taken out of Telegraph Hill, and the excavation of that stone was necessary to give room to carry on the work. There was a double object attained: taking out the stone to obtain space, and to obtain material to carry on the superstructure. Instead of this, pressed brick was substituted, brought from the Atlantic States, at an enormous expense. To this *Briceland* protested; *Flint* was never consulted. Then where was the authority to make these changes? Again, they had not the authority under this power of attorney, to change the plans. It was not contemplated to invest them under it with any such authority. A tenant in common cannot, without the consent of the other co-tenants, make repairs upon the common property. 4 *Johns. Ch.*, 334 ; 2 *Richardson*, 317. In the case of tenants in common of a party wall, the law provides that it shall be preserved in *statu quo*, and then, when re-

pairs are necessary, the tenants in common, upon notice, shall contribute ; but then, the party wall must not be higher nor broader. In this case, all the parties agree to put up the warehouse according to particular plans, and out of the materials upon the lot. It is now said that the majority controls ; but in matters of this kind, the majority cannot control. If a tenant in common refuses to improve property, it must be divided. If not such property as can be divided, (as in the case of a ship,) then it shall be sold, and the proceeds distributed. In this case, the plans had been agreed upon, and the agents had no authority to alter them. They could only be altered by the concurrence of all the owners. But here one owner alone changes the entire plan, and substitutes pressed brick for cheap stone ; and not only that, but delays the building for several months, thereby depriving *Hastings* of his bargain, that the warehouse should be finished by the middle of October. And all this contrary to an express agreement made between the owners themselves. The alterations were clearly made without authority, and *Hastings* cannot be held bound by them.

With regard to the question of negligence. *Dr. Hastings*, having come back and found this large suit pending, and retaining defendants to defend it, and rooming with *Mr. Peachy* while he remained here, it would be the most natural thing for him to do, (and it is most probable that he did,) to give *Mr. Peachy* a history of the case, and it is impossible that in doing so, he could have overlooked the important fact that, when he went away, it had been agreed that the work was to have been completed for $19,000, and that he had a right to believe from the then condition of the building and wharf, that the receipts would go far towards, if they would not entirely meet, his share of the expenditures. *Hastings* says that he stated all these facts. They are set out in detail in the complaint. The answer denies them collectively. I think that by the rules of pleading, this allegation of the complaint is to be taken as true, for all the purposes of the answer. But it will hardly be necessary to resort to legal inferences, arising from the state of the pleadings, to insist that *Hastings*, before his departure, must have communicated fully to his counsel all the

facts of the case. I repeat that we do not complain that *Mr. Shafter* did not conduct that action as well as it was possible to have been conducted from the information given him, but we do complain of the defendants for not having communicated to *Mr. Shafter* what they knew. Is it possible that *Dr. Hastings* could have omitted to mention the fact that the money was borrowed without his authority, and that it was expended contrary to his wishes? *Mr. Shafter* says that, in his numerous interviews with *Hastings*, " his principal grievance appeared to be, that we had not defended the case on the ground of the departure from the original plan." How could he have expected such a defense, unless he had communicated the facts? Defendants did not even suggest to *Mr. Shafter* the existence of the most important fact for the defense : that it had been agreed between all the owners that the plans of *Dr. Hastings* were to be observed in the completion of the building, and that no alterations were to have been made. If these facts had been adduced, *Judge Shattuck* would not have decided as he did.

There is also evidence of negligence in allowing the judgment by default to be taken against *Dr. Hastings*. *Mr. Peachy*, when he consented to waive service of summons by publication, did not even read the stipulation, and knew nothing about it, until one morning he found a judgment against *Dr. Hastings* and his property levied upon under execution issued on that judgment. But *Mr. Peachy* had no right to waive the publication of summons. Had he not done so, *Dr. Hastings* must have seen the notice, and he could have been here to attend to the action himself. He could have proven the facts which he has proven now, and which his counsel should have proven then. *Dr. Hastings* must have seen the notice, had it been published. With all his property and his home in *California*, he would have read every *California* newspaper that he could find anywhere, and they go everywhere. Had he known when his case was coming on, he could have returned, and changed its result. *Mr. Peachy* had no right to waive the publication of summons. But he did not read the stipulation which *Mr. Hackett* sent him. Was this the attention to his interests which *Dr. Hastings*, in *Europe*, had a right to expect from his coun-

sel ? This is one item of the negligence which he charges. In permitting the default to be taken, and in neglecting to inform *Mr. Shaffter* that the partners had agreed upon certain plans, and that it was to be a self-sustaining work, we conceive to have been acts of negligence.

We now come, to another, greater and more important error, on the part of the counsel of *Dr. Hastings*, in the suit brought against him by *Adams & Co.*, and that is, that after the testimony of *Haven* and *Briceland* was heard, they omitted to call the only men who could have thrown any light upon the matter—they omitted to call *Flint* and *Huerne*, to prove the changes that had been made, and the consequences of these changes. *Mr. Huerne* was in the court-house at the time of the trial, but was not examined ; and neither he nor *Mr. Flint* were ever spoken to on the subject.

Another important branch of the negligence of which we complain, is this : that when the judgment was obtained in *Judge Shattuck's* court, the principal point in the case was as to the construction of the instrument, and one would suppose that that point would be raised in the supreme court. But they waived that, too, and with it *Hastings'* case. Why did they not allow the supreme court to pass upon the only question of law in the case ? How could they, in the exercise of the most ordinary diligence, have admitted that which there was no evidence to prove, that " this money was advanced at the special instance and request of the defendant," and also, that *Haven* and *Briceland* had full authority to borrow money ? There was nothing left in the case. The question of interest alone, and only one-half of that—that is, when it was to commence—was brought before the court, and they decided it.

But there was another chance for *Hastings*, and that was the new trial awarded by the supreme court. That was all that he had wanted. But then his counsel signed another stipulation, and waived that, also. This was an act which they had no right to do. If they thought that a new trial would have the same result, they might have abandoned the case, and left *Hastings* at liberty to employ some one else. They had not the right, in opposition to his wishes, to throw away a new

trial altogether. When an attorney commences suit, he is bound to take every continuous step, from the beginning to the end, without any new request from the party, and is not justified in abandoning a case until it is concluded. And further, an appeal is as much a part of his duty as to commence suit, and I think all the authorities go to sustain that position. 3 *Johns.*, 184 ; 6 *Eng. C. L.*, 401 ; 15 *Mass.*, 315 ; 15 *Pick.*, 440 ; 5 *Moore & Paine*, 284 ; 2 *Chitty*, 311 ; 2 *Chitty Pl.*, 271. We think these various points show sufficient negligence on the part of the defendants to render them liable to *Dr. Hastings*, and more particularly than any other we rely upon the last that has been noted : that defendants were guilty of extreme negligence when they entered into the stipulation by which they waived the new trial which the supreme court had awarded, thereby depriving plaintiff of his last opportunity to make such a defence to that action as he has here shown that it was in his power to have made.

NORTON, J., charged the jury. This case, the trial of which has occupied your attention for the last few days, is of a peculiar character, and one which is not very frequently presented. The principal difficulty involved in the case is, that the jury are required to pass upon the conduct of professional men, in regard to the degree of skill and diligence which they have exhibited in the course of the performance of their professional duties—a difficulty encountered in the decision of all cases of this nature, but which becomes materially enhanced when the conduct or acts of attorneys becomes the subject of consideration. In these cases, perhaps, ordinarily the court can best judge as to the real merits of the controversy. Generally, in cases involving the question of the liability of persons following a distinct trade or occupation, such as that of a mechanic, for example, for damages resulting from their alleged unskillfulness or carelessness, neither court nor jury decide upon that question from their own individual judgment or their knowledge of that trade. In such cases witnesses are introduced and examined touching the precise point involved, and the question is then determined according to their testimony. In these cases there is generally but little difficulty. In the case before you, however, no

31

such testimony has been adduced, for the reason, probably, that the expectation has been that the court would so instruct you as to enable you to arrive at a correct conclusion from a consideration of the facts bearing upon this question, which have been proven upon the trial. In some of the cases to which I have been referred, the court has instructed the jury directly and positively upon this matter of negligence as a question of law, while in others the jury have passed upon it, under general instructions from the court, according to their own judgments.

That which, in my opinion, constitutes the most important, and which must be the controlling, fact in this case, was only brought to my attention towards the conclusion of the argument of counsel yesterday, and upon reflection I can see but very little for the jury to pass upon. In my opinion the liability of the defendants must be determined by the decision of questions which are in themselves essentially questions of law, and therefore addressed to the court, and not to the jury, for decision.

A determination of the question as to the liability of these defendants, renders it necessary, to some extent, to reconsider the action of *Adams* v. *Hastings.* That was instituted, as the evidence has shown you, for the recovery of a certain indebtedness of *Hastings* to those plaintiffs, which was created on his behalf in his absence by his agents and attorneys in fact, *Haven* and *Briceland,* and the principal question there raised and discussed was, whether or not they, the attorneys, had the authority to contract that indebtedness.

Their power, whatever its extent, was derived through and by virtue of the power of attorney executed by *Dr. Hastings* upon his departure for the eastern states. Being then solely conferred by this instrument, its extent and limitations must be determined by the construction which shall be put upon the power of attorney; and this, like all other questions of a similar character, that is, all those arising in the determination of the scope and effect of written instruments, is a matter of law, to be passed upon by the court. It is true that questions of this character are often submitted to juries for them to pass upon, but always accompanied by direct instructions from the court, charging them that if they shall find that the evidence discloses the existence of a certain

state of facts, then from these facts the law implies a certain consequence, which is also declared to them, and which they are instructed to express by their verdict; so that, as matter of practical effect, sub mitting the construction of a legal instrument to a jury, is rather a matter of form than an actual submission of the question to them—their real province being to determine the exact facts and circumstances the existence of which the testimony has disclosed.

Such a case would be presented here if the former action of *Adams* v. *Hastings* were at present before you ; but the principal difficulty encountered now, arises mediately from the fact that you are not exactly trying the issue between *Adams & Co.* and *Dr. Hastings.* The question is as to the manner in which *Halleck, Peachy & Billings* defended that action—it is their conduct which you are to consider—their professional conduct in a matter entrusted to their charge in their character as attorneys. And with regard to this matter I shall charge you as requested, that the presumption is that defendants did discharge their duty to *Dr. Hastings* as professional men—that the burden of proof lies with him, and in order to recover, it is incumbent upon him to establish affirmatively the fact of negligence and want of due diligence on the part of defendants. *Hastings* may not have any right to a recovery against them, merely because they did not successfully defend the action in the superior court, and that may hold true, although they *might*, perhaps, have brought it to a different determination. The main proposition is, that they are liable for damages arising from a want of a reasonable degree of diligence and skill. It is not required of an attorney that he should exhibit the utmost professional skill in the conduct of a cause ; in order to charge him with a liability for a loss resulting to his client, it is not sufficient that the jury should simply believe that the action *might* have been more successfully prosecuted (though, this fact must be established before a liability can be attached)—but he will be liable for whatever damage the client may have sustained by reason of his failure to exercise ordinary and reasonable skill and care.

This proposition is true of all the professions and trades. In the merely mechanical trades—in those in which manual dexterity is the

predominant feature—the question of ordinary and reasonable skill, presents, as I said, but little difficulty ; but where the occupation is one requiring the exercise of the mental, rather than the physical powers ; where the operation to be performed must be done according to the dictates of the judgment, as it shall deem advisable ; where the difficulty, whatever there may be in the operation to be undertaken, is to be overcome by mental, and not merely manual or physical exertion ; then in all such cases the difficulty of determining the question, whether or not the operator exhibited ordinary and reasonable care or skill, is much greater. To take an example of each of the different classes, as, for instance a wheelwright and a surgeon. In the case of the former, no matter what the particular piece of work, which he was called upon to perform in the course of his business, might have been, it would be difficult to conceive of one in which it would not be easy to declare whether or not he had exhibited a want of ordinary professional skill. But in the second case—that of the surgeon—there might be more difficulty than could arise in the case of the wheelwright. This example embraces in a degree the elements of both classes of professions ; it requires the exercise of the judgment, and of a certain manual dexterity peculiar to itself ; and questions involving the liability of surgeons for alleged professional negligence or maltreatment, may involve considerations which would ordinarily be given to each of the classes. If the point presented involved solely the question of the surgeon's manual dexterity, as exhibited in some surgical operation, the difficulty experienced would be of precisely the same nature as in the cases of the wheelwright, although, perhaps, it might be somewhat enhanced in the former case, by the fact that the operation was one involving a higher degree of dexterity. To take as an example, the case of setting a broken leg. If the point were conceded that it was necessary that the leg should be set, then it would probably be easy to decide whether or not it was done in an unskillful or negligent manner. But if the point in controversy were, not as to the manner in which the operation of setting the leg was actually performed, but as to whether or not it should have been set at all, (it might be claimed that it should have been cut off, for instance,) then there would be

more difficulty, for in that case the exercise of the surgeon's judgment would have been called into requisition, and it might be difficult to say that he acted in so negligent or unskillful a manner as to render himself liable, particularly where there may have been some doubt as to which of the two courses it would have been proper to have adopted. So in conducting a cause, where the attorney's judgment is called into action from the beginning to the end—the *bona fides* of his conduct not being questioned—it will almost always be difficult to determine whether or not he has done any act, or has pursued a course, which is so far from what a man in the exercise of ordinary skill and care, would have done or pursued, that he will be liable to his client by reason of his conduct.

It is true that there may be cases in which the error is so palpable, the negligence so manifest, that a court or jury would be authorized at once to declare that the case displays a want of reasonable diligence and skill. There are in this case various errors charged upon defendants, all of which, it is claimed, show that the defense of the action was not conducted with reasonable skill and care. One of these to which your attention and that of the court has been directed, is the action of *Mr. Peachy* with regard to the stipulation entered into between *Mr. Hackett* and himself relative to the publication of summons against *Dr. Hastings*. It appears that an understanding was had between the counsel, by which defendant's attorneys agreed to waive the actual publication of summons, and that they would, within the one hundred and thirty days, allowed by law, to an absent defendant to come in and defend, file an answer on behalf of *Dr. Hastings*. *Mr. Hackett* drew up a stipulation which he subsequently presented to *Mr. Peachy*, representing to him that it contained the conditions of the understanding to which they had previously arrived, and requested him to sign it, which *Mr. Peachy* did. It appears, however, that this stipulation, probably from some error of *Mr. Hackett* in his computation of the time, was not worded in accordance with the understanding as it was actually had between the parties, or at least as *Mr. Peachy* understood it, the time for answering having been made shorter than that allowed by law, (and which, according to *Mr. Peachy's* understanding of the agreement, he was to receive,) by thirty days.

The consequence was that a default was entered against *Dr. Hastings*, which however, was subsequently opened, although at an expense of about seventy dollars. Now the action of *Mr. Peachy*, in signing this stipulation, was almost a purely mechanical one ; he had previously resolved upon the propriety and expediency of the step, and this was merely carrying into execution, a previously conceived intention ; he probably relied upon *Mr. Hackett's* accuracy to make the proper calculation, and took it for granted that he had done so ; but ordinary care would require him to have examined the stipulation before signing, and he would be liable to his client for any damages that resulted from it, but in this case no damage resulted, and it is only alluded to as an illustration.

In the conduct of an action, ordinary skill and care is required in the preparation of the case for trial, that is, in procuring the attendance of witnesses, in ascertaining from them the facts which they can establish by their testimony, and in taking such other steps as may be needful or requisite to a proper trial of the case. After this, there must be ordinary professional care and skill employed in and during the progress of the trial. And very often in regard to this point, there may be difficulty in arriving at a determination, although in this as in all other instances, the' negligence may be so extreme as to be easily declared. As for instance, if an attorney, after procuring his witnesses, should omit to examine them, or, although he may have placed them upon the stand, should have failed to elicit from them their knowledge of facts which may have been important, if not absolutely essential, to his client's case, and with regard to which he knew they would have given testimony if interrogated.

These are facts which might sometimes be shown in an action like that now before you. But in this case, I believe it is not contended that any negligence of this character on the trial was exhibited by defendants. The main charge against them is, that they did not make sufficient preparation for the trial ; that is, that they did not, by proper inquiry and investigation, ascertain the existence of the facts which have been proven here with regard to the great question involved in that case,

namely, whether or not *Haven & Briceland* had authority to borrow money for *Dr. Hastings*. Now it was undoubtedly their duty to have made diligent inquiry and search as to all the matters affecting that question, and if they did make such investigation to the best of their ability — if they did with due diligence make all inquiry which lay in their power — if they did examine into the existence of all the facts which *Dr. Hastings* may have communicated to them, which may have gone, or tended, to make out a defence to the action, and did ascertain, so far as they were able, the means of substantiating those facts — then, in that particular, namely, the preparation of the case for trial, they fully discharged their duty towards *Dr. Hastings* as his attorneys.

I stated that although defendants may have been guilty of negligence in conducting the defence of *Adams* v. *Hastings*, yet *Dr. Hastings* may nevertheless not be entitled to recover anything against them — that is, he may not have sustained damage. He can recover any damage clearly attributable to their negligence, but he must establish affirmatively not only the fact of negligence, but also the fact of damage. It might be that the loss of that suit could be shown to have been directly caused by carelessness on the part of defendants, but even then *Hastings* is none the worse by such loss, unless there was a valid defence to the action. It is incumbent upon him to show this fact affirmatively, and unless he has now established the fact that he had a good defence to that action — unless he has here proven facts which, had they been established in the prior suit, would have changed its result, then he can recover nothing. I shall give you therefore the charge requested — that if there was no substantial defence to the action of *Adams* v. *Hastings* — if no just and proper defence could have been set up in said action, then defendants are not liable to plaintiff in this action.

And this brings me to the last charge requested, that if the jury believe that any important matter was omitted in the defence of the action in consequence of the absence of *Dr. Hastings*, which might have been done had he been present aiding and assisting, and that absence was not caused by the advice of the defendants, then they

are not liable in this action.   I shall give this instruction, but must modify it.   I have stated that it was the duty of defendants to have made all reasonable inquiry and investigation into the facts bearing upon the issue, and the defence set up.   This being so, I shall charge as requested, that defendants are not liable for the non-production of facts, occasioned by the absence of *Dr. Hastings,* provided, however, they could not by such diligent inquiry and search, have discovered those facts.   Having undertaken the defense with a knowledge that *Dr. Hastings* would be absent, it was a part of their duty to look up such facts as they could, and then, if there were any facts remaining behind which they could not by reasonable diligence have ascertained, but which, had *Dr. Hastings* been present, could have been established, then he, and not the defendants, must bear the responsibility of the non-production of those facts.

The action of *Adams* v. *Hastings* was, as has been proven, instituted to recover the amount of certain advances made by the former on behalf of the latter, to defray his share of the expenditures made on the common property.   The money was advanced at the instance of *Hastings'* agents, who were acting under a power of attorney. The great question there raised was that this power did not confer the authority to borrow money.   The fact that the alterations had been made in the original plan—that *Hastings,* prior to his departure, made a proposition to the then plaintiffs to advance money at a certain rate of interest, which proposition they declined to accept—that the advances had been actually expended on the improvements, were all established on the former trial, and in view of these facts judge *Shattuck* decided that under the power of attorney the agents had the authority to borrow money.   If, on this trial there have been presented facts which were not proven, owing to a want of proper care, before judge *Shattuck,* which facts have so important a bearing upon the issue then joined that had they been proven, they would have changed the result of that action, then defendants are now liable for not having proved them; but if these new facts would not have affected that result, then they are not.   I shall charge distinctly, in order that *Dr. Hastings* may have the full benefit of the charge, should

it be erroneous, and may have the ruling of the supreme court upon the construction of the power of attorney, (what he ought to have had before,) that the new facts which have been now proven, are not sufficient to have changed that result. These new facts are, that prior to *Dr. Hastings'* departure it was agreed among the owners that the North Point works should be completed out of the funds to be derived from the improvements themselves, and that the improvements should proceed according to his plans. These two are the only facts which have now been proven, in addition to those which were established before; and as I stated, I shall charge that these are not sufficient to have changed the decision of judge *Shattuck*. The defendants are not liable for the non-production of evidence which would have been unavailing if it had been produced. If they had put *Huerne* and *Flint* on the stand they could have proved the additional facts, but if these additional facts would not have affected the result, then the fact that they omitted to do so, cannot have prejudiced *Dr. Hastings*. Judge *Shattuck* decided that the power of attorney was broad enough to authorize them to borrow the money from *Adams & Co.*, and to execute the instrument upon which suit was afterwards brought. The judgment in that action was adverse to *Dr. Hastings*, and defendants appealed.

It is impossible not to see that this appeal must have been mainly to have the decision of the supreme court upon this great point; instead of which defendants in their transcript admitted the authority, and carried the case up on the question of interest alone. The main ground of defence was admitted adverse to defendant, and the supreme court were only asked to decide whether or not he must pay interest. The court reversed the judgment of the court below, upon this point, and awarded a new trial. Then defendants stipulated that judgment should be entered in favor of *Adams & Co.* upon deducting the interest only. In the present case this is the great question as bearing upon the responsibility of these defendants. It is a question not free from difficulty, and is one upon which it is not pleasant to be constrained to instruct you. I feel bound, however, to charge you, that after having made the proper objections, and taken the proper

32

exceptions on the trial, the omission to embody them in the statement so as to obtain the decision of the supreme court upon the main question, and then waiving by stipulation a new trial, on which the question might have again been raised, that defendants were guilty of negligence, or the omission to exercise ordinary care and skill, and are liable for any damages · which plaintiff may have sustained by reason thereof.

I have said that there is very little in this case for the jury to pass upon, and this holds true notwithstanding the instruction that defendants have rendered themselves liable for all damage which *Hastings* has sustained. He claims that if there had been a new trial, he would have presented facts which would have altered the material merits of the case. He would have proven the same facts which he has proven on this trial, and this raises the question — has *Hastings* here shown any facts which would have altered the material merits — has he shown any facts which, if they had been proven before, would have changed the result of the action. I have charged that he has not. The new facts which have been proven leave the liability of *Hastings* to *Adams Co.* the same that it was before. The merits of the case have not been changed, and therefore *Hastings* sustained no damage by defendants' stipulation to waive a new trial.

This proceeds upon the assumption that judge *Shattuck* was right in his construction of the power of attorney. The decision of judge *Shattuck* is not binding upon this court, but I should be reluctant to give a decision which would in effect, overrule the decision of a court of concurrent jurisdiction. That is properly the business of the supreme court. For the purposes of this trial, I shall therefore charge you that the power of attorney, under the circumstances, was sufficient to authorise the borrowing of the money, and that hence *Hastings* had no valid defense to that action, and has sustained no damage. If I am wrong in thus instructing you with regard to the question of construction, and judge *Shattuck* was also wrong, then the supreme court can reverse my judgment, in the event of an appeal being taken, and *Hastings* can then have a judgment for the damage which that decision may show that he has sustained.

The case, however, having been submitted to the jury, the court is not at liberty to take the decision of it from them entirely. I shall therefore charge, (and the jury will bear in mind what I have already said,) that if you find that defendants have not exercised reasonable diligence and skill, in their profession as attorneys, in conducting the action of *Adams* v. *Hastings*, then they are liable for all damage which plaintiff has sustained by reason of their negligence. This negligence plaintiff must have affirmatively established. It must be shown, however, that *Hastings* had a good and valid defence to that action before defendants can be charged with any liability. The jury will first consider the action of defendants in preparing the case for trial, and pending the trial itself. If defendants then omitted to do anything to the defence of the case, which if it had been done, would have been unavailing, then they are not liable for such omission. That is, in other words, they are not liable, no matter what they did, or omitted to do, unless *Hastings* had a valid defence to the action. That is the first point which he must establish. And further, if any important matter was omitted in consequence of the absence of *Dr. Hastings*, and that absence was not occasioned by the procurement or advice of the defendants, and the defendants could not by reasonably diligent inquiry have ascertained that matter, then they are not liable for not having produced it. If no negligence has been established against defendants up to and during the trial, then the jury are to consider the subsequent facts. If they believe that in stipulating that judgment should be entered in favor of *Adams & Co.*, and that the new trial awarded by the supreme court be waived, defendants were guilty of negligence, then they are liable for all damage which plaintiff may have sustained by reason of such negligence ; but in determining the amount of damage, the jury will bear in mind the instructions already given. If the jury find for plaintiff, the amount of damages to which he may be entitled will be the amount which he has actually paid out by reason of the recovery of the judgment against him, and not the present value of the interest in the property, which was sold to satisfy the judgment.

The jury returned a verdict in favor of the defendants.